IN THE COURT OF APPEALS OF NORTH CAROLINA

 2021-NCCOA-215

 No. COA20-241

 Filed 18 May 2021

 Cumberland County, No. 18 CRS 53257

 STATE OF NORTH CAROLINA

 v.

 WILLIE PEARL MACK, JR.

 Appeal by Defendant from Judgments and Orders entered 5 August 2019 by

 Judge Jeffery K. Carpenter in Cumberland County Superior Court. Heard in the

 Court of Appeals 10 March 2021.

 Attorney General Joshua H. Stein, by Special Deputy Attorney General Anne J.
 Brown, for the State.

 Appellate Defender Glenn Gerding, by Assistant Appellate Defender Wyatt
 Orsbon, for defendant-appellant.

 HAMPSON, Judge.

 Factual and Procedural Background

¶1 Willie Pearl Mack, Jr. (Defendant) appeals from Judgments entered upon jury

 verdicts finding him guilty of Second-Degree Rape (under former N.C. Gen. Stat. §

 14-27.3) and Second-Degree Sexual Offense (under former N.C. Gen. Stat. § 14-27.5).

 Additionally, Defendant seeks a Writ of Certiorari from this Court to review Orders

 requiring Defendant to register as a sex offender and to enroll in satellite-based
 STATE V. MACK

 2021-NCCOA-215

 Opinion of the Court

 monitoring for the rest of Defendant’s life. The Record, including evidence adduced

 at trial, tends to reflect the following:

¶2 Tamara1, the alleged victim in this case, moved to Fayetteville, North Carolina

 from Washington, DC in 2011. On the night of 2 August 2011, Tamara was in a park

 in downtown Fayetteville “doing drugs” with “a couple of homeless people[.]” At some

 point, Tamara decided to take a walk in order to “score drugs.” Tamara admitted to

 having traded sexual acts for drugs in her past, but had stopped doing so because she

 was “deathly afraid” of contracting HIV. On the night in question, Tamara had her

 former boyfriend’s food stamp card which she planned to use to “swap for some drugs.”

¶3 Tamara recalled seeing a man “way back” behind her as she walked and that

 the man was walking “extremely fast.” Tamara noted, “every time I looked back he

 was just closer and closer. Like I felt like he was running up on me. . . . I stopped just

 to let him pass me[.]” According to Tamara, “[the man] spoke and I spoke back, . . . I

 remember him telling me I had a pretty smile . . . I don’t remember how the drug

 conversation came up, but he was like yeah, I know somebody.” The man told

 Tamara, “I can take you to get some, you know, don’t worry about it. Just follow me.”

 Tamara had followed strangers to find drugs before, and she was willing to “take that

 1 We use the parties’ stipulated pseudonyms: “Tamara” for the alleged victim in this

 case; and “Kesha” for another alleged victim of Defendant who testified for the State at trial.
 STATE V. MACK

 2021-NCCOA-215

 Opinion of the Court

 gamble.” However, Tamara denied the man ever requested Tamara exchange sex for

 drugs.

¶4 Tamara followed the man, and the two turned down a street Tamara

 recognized because she “might have been down there to somebody’s house” in order

 to use drugs. Tamara continued to follow the man around a corner to an open area

 behind a building. When Tamara rounded the corner with the man, the man “turned

 on me real quick. . . . [H]e grabbed me by my neck. And I’m not going to say he

 squeezed me - - the life out of me where I couldn’t breathe, but he was squeezing

 pretty hard. I knew what was getting ready to happen.” The man told Tamara if she

 moved or screamed, “he’s going to f[---]ing kill me and he asked me was I going to be

 a good girl.” Tamara “never knew what fear was until that day” and that she “couldn’t

 cry.” The only thing she could say was “please don’t kill me[.]”

¶5 Then, the man started “feeling all over” her. At first, Tamara thought the man

 might be robbing her, but “everything he took out, he put back.” The man forced

 Tamara’s head down and made her perform oral sex on him. Then, the man pulled

 Tamara’s pants down, “got behind” her, and “had sex with [Tamara] from behind until

 he ejaculated.” Tamara also recalled the man “kissed me passionately like we was in

 a relationship” after the rape. Tamara stated the kiss made her sick to her stomach.

 The man never gave Tamara any drugs and Tamara had never promised to exchange

 sex for drugs. After the rape, the man ran away. Tamara then ran “over to the Burger
 STATE V. MACK

 2021-NCCOA-215

 Opinion of the Court

 King” nearby where people told her there were police officers present. Tamara did so

 because she “knew he messed up when he ejaculated in me and it was no way I was

 going to let that get out of me.”

¶6 After midnight on 2 August 2011, Officer Zaira Scott, with the Fayetteville

 Police Department, was at a Burger King restaurant in downtown Fayetteville with

 Officer Scott’s training officer discussing a call to which the two had just responded.

 As Officer Scott and the training officer were talking, a woman approached the

 officers’ vehicle and told the officers she had just been “sexually assaulted.” The

 woman, Tamara, was “[u]pset,” “angry,” and “crying[.]” Tamara told Officer Scott

 that a man had been following her as Tamara walked down Person Street in

 downtown Fayetteville. Tamara told the officers the man “forced” her to walk behind

 a building and “choked her by putting his hand around [her] neck.” According to

 Tamara, the man threatened to kill her if she did not do “what he told her to do.”

 Tamara described her assailant as a bald man with “a little thin mustache.”

¶7 Tamara recounted the assault to the officers stating: “the black male pulled

 her pants down and penetrated her vagina with his penis.” After Tamara recounted

 the alleged assault to the officers, the officers searched her and “put her in the back

 of [the] patrol car[.]” The officers found no illegal contraband on Tamara. The officers

 took Tamara to the alleged crime scene where the officers collected a Pepsi bottle

 from which Tamara claimed her assailant had been drinking. The officers then took
 STATE V. MACK

 2021-NCCOA-215

 Opinion of the Court

 Tamara to Cape Fear Valley Hospital for “medical assistance,” and she “agreed to do

 [a] sexual assault kit.”

¶8 After reviewing a report of the incident, Detective John Benazzi, who was at

 the time with the Fayetteville Police Department’s Special Victims Unit, contacted

 Tamara in order to investigate the alleged rape. According to Detective Benazzi,

 Tamara “reiterated exactly what she told” the two officers on the night of the incident.

 Tamara told Detective Benazzi her assailant was a “black male about 40 years old,

 bald head . . . and a mustache.” Detective Benazzi did not find a person matching

 that description when he searched a nearby bus station. Detective Benazzi

 assembled a “photo array” of potential suspects based on Tamara’s description of her

 alleged assailant. Tamara “did not make an identification with anybody in that photo

 lineup.” When Detective Benazzi spoke with Tamara after the photo lineup, Tamara

 “was still very scared” and did not want to stay in Fayetteville any longer. The

 Fayetteville Police victim advocate obtained a bus ticket for Tamara so she could go

 to Winston-Salem. Eventually, Fayetteville Police “inactivated” Tamara’s case as

 “there were no further leads to follow up on[.]”

¶9 Several years later, in 2015, the Fayetteville Police Department received a

 federal grant to investigate the Department’s “backlog” of untested sexual assault

 kits. Fayetteville Police sent Tamara’s sexual assault kit to the Federal Bureau of

 Investigation (FBI) for testing in December 2016. The FBI’s testing returned a
 STATE V. MACK

 2021-NCCOA-215

 Opinion of the Court

 potential match to a “Willie Mack” already in the national database. Based on this

 potential match, Detective Benazzi “started trying to reach out to [Tamara].”

 Detective Benazzi was able to find Tamara when Tamara appeared for a court date

 in Forsyth County in December 2017. When Detective Benazzi showed Tamara a

 picture of Defendant, Tamara stated: “Wow. Wow. That’s the man who raped me.”

¶ 10 Detective Benazzi obtained a search warrant to collect DNA evidence, in the

 form of buccal swabs, from Defendant. The FBI’s comparison of the DNA from

 Defendant’s buccal swabs indicated a match with the male DNA from Tamara’s

 sexual assault kit. Detective Benazzi interviewed Defendant as he was executing the

 search warrant to obtain Defendant’s buccal swabs. During the interview, which

 Detective Benazzi recorded, Defendant said he was in Oklahoma during 2011.2

¶ 11 A Cumberland County Grand Jury Indicted Defendant on charges of Second-

 Degree Rape, First-Degree Kidnapping, and Second-Degree Sexual Offense involving

 the alleged victim Tamara on 11 February 2019. The Grand Jury also indicted

 Defendant for attaining Habitual-Felon-Status. Defendant’s case came on for trial in

 Cumberland County Superior Court on 29 July 2019.

¶ 12 During her trial testimony, Tamara, pointed to Defendant in open court

 identifying him as her assailant. She described Defendant as a “[b]lack male, bald,

 2 The State played the recording of Detective Benazzi’s interview with Defendant for

 the jury during direct examination of Detective Benazzi.
 STATE V. MACK

 2021-NCCOA-215

 Opinion of the Court

 thin mustache.” On cross examination, Defendant’s counsel asked Tamara: “Now,

 you were pretty pissed about the situation when there weren’t any drugs involved;

 weren’t you?” Tamara responded: “I was pretty pissed at the fact that I thought this

 was going to be an easy transaction and not a rape.”

¶ 13 Jade Gray, a supervisory biologist forensic examiner in the DNA casework unit

 at the FBI laboratory, testified for the State. After the trial court accepted Gray as a

 DNA expert, Gray testified her lab received evidence in the State’s case against

 Defendant in December of 2016. Gray’s team tested vaginal swabs from Tamara’s

 sexual assault kit, oral swabs from Defendant, and another sample from Tamara.

 The test of the vaginal swabs revealed “male and female DNA” and the DNA “unlike

 [Tamara’s] was consistent of having arisen from a single male individual[.]” Gray

 “selected [the male DNA] to be uploaded” into the Combined DNA Index System

 (CODIS) to see if the male DNA profile matched any profiles already in the database.

 Gray testified the male DNA tested and uploaded came back as a match in the

 database to a Willie Pearl Mack. On 29 June 2017, Gray sent a letter to Lieutenant

 Somerindyke, with the Fayetteville Police Department, informing him that the male

 DNA returned a CODIS match to a Willie Pearl Mack.

¶ 14 According to Gray, after testing the buccal swabs Detective Benazzi obtained

 from Defendant, the comparison between the male DNA profile from Tamara’s sexual

 assault kit and the profile from Defendant’s buccal swabs revealed that the male DNA
 STATE V. MACK

 2021-NCCOA-215

 Opinion of the Court

 from the sexual assault kit was “660 sextillion times more likely” to have come from

 Defendant than from another contributor. This likelihood “fell into [Gray’s lab’s]

 highest level of support for identification.”

¶ 15 Prior to trial, the State had indicated its intent to introduce evidence of

 Defendant’s prior bad acts—including evidence of other rapes committed by

 Defendant—pursuant to Rule 404(b) of the North Carolina Rules of Evidence. In

 response, Defendant filed a Motion in Limine seeking exclusion of such evidence.

 After other witnesses testified, the trial court heard—outside the presence of the

 jury—both parties on the issue of evidence of Defendant’s prior alleged rapes. The

 State only had witnesses present who could testify about one of the alleged rapes

 involving a woman named Kesha. The trial court heard voir dire testimony from

 Kesha about a 2009 encounter with Defendant where Kesha alleged Defendant raped

 her. Kesha testified she lived in Fayetteville and, on the morning of 29 July 2009,

 she was supposed to be at court in downtown Fayetteville by 9 a.m. as a witness.

 Kesha further stated, after she missed the bus she planned to take to court, she tried

 to find “a ride” to get to court. Kesha said she needed a light for her cigarette and

 was planning to offer someone “a couple dollars” to give her ride to court. According

 to Kesha, a man in a burgundy “F150” stopped. Kesha “asked him for a light” and if

 she could give him the money to take her to the courthouse. When Kesha got into the

 truck, the man pointed a gun at her and told her he would “either blow [her] brains
 STATE V. MACK

 2021-NCCOA-215

 Opinion of the Court

 off or kill [her]” if Kesha was not quiet. Kesha testified the man took her to a secluded

 area and forced her to have oral and vaginal intercourse several times. After the man

 had finished, Kesha stated she got out of the truck and sought help.

¶ 16 After voir dire, the trial court stated: “the [S]tate has indicated its intent to

 tender this evidence for the purpose of showing a plan, identity and/or modus

 operandi[.]” The trial court found “as a matter of law that the evidence is relevant.”

 The trial court further found:

 The similarities between the cases the Court finds are as follows.
 Both the alleged victims were African-American females. They
 were both in Fayetteville . . . In both cases, there was the
 occurrence of vaginal and oral -- forced vaginal and oral sex. Both
 victims were on foot at the time of the assault. Both victims were
 moved to secluded areas for facilitation of the assaults. There was
 a threat to kill both victims and the alleged assailant, as to both
 cases, was a stranger to the victim in each case.

 The trial court concluded, as a matter of law, the evidence was not admissible under

 Rule 404(b) to show common plan, scheme, or modus operandi. However, the trial

 court found that “identity is an issue.” The trial court found that Defendant stated

 to investigators in Tamara’s case that he “was not in Fayetteville in 2011.” The trial

 court further found, as to identity, there was “a substantial similarity in the two cases

 . . . as both victims in each case identified the assailant as a black male, bald headed

 with a mustache.” The trial court concluded it would allow the evidence of Kesha’s

 alleged rape for the purpose of proving the identity of the assailant in Tamara’s case
 STATE V. MACK

 2021-NCCOA-215

 Opinion of the Court

 and give the jury a limiting instruction on that evidence. Defense counsel objected to

 the trial court’s rulings.

¶ 17 The State called Kesha to testify before the jury. Kesha testified that, on the

 morning of 29 July 2009, she was supposed to be a witness in court. Kesha said she

 needed a ride to the courthouse because she had missed the bus she was going to take

 to the courthouse. Kesha stated as she was walking to the courthouse shortly after 8

 a.m., “[a]n individual in a red truck stopped me and I asked for a light to my cigarette.

 Then I asked him could I get a ride to downtown to get to court because I didn’t want

 to be late.” Kesha said the man in the red truck offered to light her cigarette and that

 she offered the man “a few dollars” in gas money if he would give her a ride to court.

¶ 18 The man driving the truck agreed to take Kesha to court. Kesha described the

 man as “a Black male. He has a bald head and wears a mustache.” Kesha testified,

 as she got in the truck and tried to put on her seatbelt, the man “pulled [a gun] on

 [her].” Kesha said the man told her if she did not cooperate, the man would “blow my

 head off or kill me[.]” According to Kesha, the man took her down a secluded dirt

 road into a wooded area. Kesha stated the man: “pulled out his penis. He stuck it in

 my vagina, took it out my vagina, put it in my mouth, put it back in my vagina and

 put it back in my mouth and ejaculated.” Kesha said she did not consent to the sexual

 acts and that the man had not promised anything to Kesha in exchange for the sexual

 acts. Kesha testified she remembered: the truck was a “red or burgundy” F-150; there
 STATE V. MACK

 2021-NCCOA-215

 Opinion of the Court

 were blankets and a bottle of baby oil in the truck; and there was a woman’s

 identification tag hanging on the rearview mirror and Kesha recounted the name on

 the tag. Then Kesha got out of the truck and used a stranger’s phone to call the police.

 The Record indicates defense counsel did not object to Kesha’s testimony when it was

 introduced at trial.

¶ 19 After the close of the State’s case-in-chief, Defendant did not offer any evidence

 in his defense. The trial court included in its jury instructions that the evidence of

 Kesha’s rape could only be considered for the purpose of proving Defendant’s identity

 in Tamara’s rape, if the jury believed the evidence. The jury found Defendant guilty

 of the Second-Degree Rape and Second-Degree Sexual Offense charges but acquitted

 Defendant on the First-Degree Kidnapping charge. The State elected not to proceed

 on the Habitual Felon Indictment.

¶ 20 During sentencing, the trial court asked the State: “What’s your position in

 regards to whether or not [Defendant’s prior Attempted First-Degree Rape

 conviction] makes him a recidivist for the purpose of sentencing in this case?” The

 State responded: “Yes, Your Honor. So I looked up the statute and the statute,

 specifically as it relates to that offense, just lists out -- it doesn’t specify the dates of

 offense.” The trial court sentenced Defendant to an active term of 146 to 185 months

 in prison on the Second-Degree Rape charge and found that “second-degree rape is a

 reportable offense as that term is defined in 14-208.6.” The trial court also sentenced
 STATE V. MACK

 2021-NCCOA-215

 Opinion of the Court

 Defendant to an active term of 148 to 185 months on the Second-Degree Sexual

 Offense charge, to run consecutively with the Second-Degree Rape sentence. The

 trial court then stated:

 In regards to AOC CR 615, show the Defendant has been
 convicted of a sexually violent offense. That’s under 1(B), that the
 Defendant has not been classified as a sexually violent predator.
 The Defendant is a recidivist, paragraph three. The offense is an
 aggravated offense, paragraph four. The offense did not involve
 the physical, mental, or sexual abuse of a minor. The Defendant
 will be required to register as a sex offender for the rest of his
 natural life, the Court determines as a condition of the statute.

¶ 21 The trial court continued: “In regards to satellite-based monitoring, that

 requires a separate hearing, Madam D.A.” The State responded: “Yes, Your Honor.”

 When the trial court asked if the State wanted to “deal with that now[,]” the State

 declined stating, “they can deal with it at a separate hearing.” Defendant gave oral

 Notice of Appeal in open court. The same day, the trial court entered written

 Judgments on the Second-Degree Rape and Second-Degree Sexual Offense

 convictions. The trial court also entered two separate Judicial Findings and Order

 for Sex Offenders—one for each conviction—requiring Defendant to register as a sex

 offender and to enroll in satellite-based monitoring, after Defendant’s release from

 prison, for the remainder of his life (Sex Offender Registration Orders).

 Issues
 STATE V. MACK

 2021-NCCOA-215

 Opinion of the Court

¶ 22 The relevant issues on appeal are whether: (I) the trial court committed plain

 error by allowing evidence of Defendant’s prior bad acts to prove his identity as the

 perpetrator in the alleged offenses in this case; and (II) whether the trial court (A)

 erred in concluding the jury had convicted Defendant of a sexually violent offense—

 and, thus, a reportable conviction, pursuant to N.C. Gen. Stat. § 14-208.6(5)—and, if

 not, (B) whether the trial court erred by not holding a hearing regarding satellite-

 based monitoring pursuant to N.C. Gen. Stat. § 14-208.40A(a).

 Analysis

 I. Prior Bad Acts

¶ 23 Defendant contends the trial court erred in admitting evidence of the prior

 alleged rape of Kesha for the purpose of proving his identity in this case pursuant to

 N.C. R. Evid. 404(b). However, despite objecting following the voir dire of the witness,

 Defendant did not renew his objection to this evidence when the State actually sought

 to introduce it. Defendant thus concedes our review is limited to whether the trial

 court’s admission of the evidence constituted plain error. State v. Ray, 364 N.C. 272,

 277-78, 697 S.E.2d 319, 322 (2010). “Under the plain error rule, defendant must

 convince this Court not only that there was error, but that absent the error, the jury

 probably would have reached a different result.” State v. Jordan, 333 N.C. 431, 440,

 426 S.E.2d 692, 697 (1993) (citation omitted).
 STATE V. MACK

 2021-NCCOA-215

 Opinion of the Court

¶ 24 “We review de novo the legal conclusion that the evidence is, or is not, within

 the coverage of Rule 404(b).” State v. Beckelheimer, 366 N.C. 127, 130, 726 S.E.2d

 156, 159 (2012). North Carolina Rule of Evidence 404(b) provides: “Evidence of other

 crimes, wrongs, or acts is not admissible to prove the character of a person in order

 to show that [the person] acted in conformity therewith.” N.C. Gen. Stat. § 8C-1, Rule

 404(b) (2019). However, such evidence may “be admissible for other purposes, such

 as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or

 absence of mistake . . . .” Id. “[B]efore evidence of other distinct crimes may be

 admitted under the [identity] exception, two requirements must be met. First, the

 identity of the defendant must be an issue in the case.” State v. Thomas, 310 N.C.

 369, 373, 312 S.E.2d 458, 460-61 (1984). “The second prong of the exception . . .

 requires that the circumstances of the two crimes be such as to tend to show that the

 crime charged and another offense were committed by the same person.” Id. (citation

 and quotation marks omitted).

¶ 25 “In a criminal case, the identity of the perpetrator of the crime charged is

 always a material fact.” State v. Jeter, 326 N.C. 457, 458, 389 S.E.2d 805, 806 (1990)

 (citation omitted). However, “identity is not always in issue.” State v. White, 101

 N.C. App. 593, 600, 401 S.E.2d 106, 110 (1991) (citing State v. Johnson, 317 N.C. 417,

 425, 347 S.E.2d 7, 12 (1986)). Evidence of prior bad acts is admissible to prove

 identity “where the accused is not definitely identified.” State v. Williams, 82 N.C.
 STATE V. MACK

 2021-NCCOA-215

 Opinion of the Court

 App. 281, 284, 346 S.E.2d 315, 316 (1986) (citation omitted). “[U]nless the defendant

 presents alibi evidence, evidence of other crimes to show identity, either directly or

 indirectly (common plan), should not be admitted[.]” Id. (quoting State v. Streath, 73

 N.C. App. 546, 550, 327 S.E.2d 240, 242, disc. rev. denied, 313 N.C. 513, 329 S.E.2d

 402 (1985)).

¶ 26 In this case, while Defendant’s identity was a material fact, it was not

 necessarily in issue. Defendant presented no evidence in his own defense, and did

 not claim an alibi at trial. The only evidence possibly giving rise to an alibi defense

 was a recording of an interview introduced by the State in which Defendant initially

 claimed he was out-of-state for the entire year of 2011. Here, however, evidence of

 the rape of Kesha occurring in 2009 is, at best, tangential to proving Defendant was,

 in fact, in North Carolina approximately two years later at the time of the rape in

 this case. Moreover, the circumstances of the two rapes, separated in time by

 approximately two years, while both horrific, are not so particularly similar as to

 necessarily constitute proof that the same individual committed both using a similar

 modus operandi. See State v. Corum, 176 N.C. App. 150, 156-57, 625 S.E.2d 889, 893

 (2006) (“[T]here must be shown some unusual facts present in both crimes or

 particularly similar acts which would indicate that the same person committed both

 crimes.” (citation and quotation marks omitted)).
 STATE V. MACK

 2021-NCCOA-215

 Opinion of the Court

¶ 27 Presuming, without deciding, however, that the admission of this 404(b)

 evidence constituted error, the second prong of our plain error analysis requires us to

 determine if, absent this error, the jury probably would have reached a different

 result. Jordan, 333 N.C. at 440, 426 S.E.2d at 697. In light of the overwhelming

 evidence of Defendant’s identity and guilt presented in this case, Defendant has not

 shown the jury would have reached a different result.

¶ 28 The State presented DNA evidence showing 660 sextillion-to-one that

 Defendant’s, and not someone else’s, DNA was in Tamara’s sexual assault kit.

 Defendant does not challenge this evidence on appeal. Further, Tamara affirmatively

 identified Defendant as her assailant and gave detailed testimony of the incident

 with Defendant. Tamara testified Defendant choked her and threatened to kill her

 if she did not acquiesce to his demand for intercourse. On cross examination, Tamara

 did not waver when asked if Defendant might have offered her something in exchange

 for sex—insinuating the encounter was consensual. In fact, she repeatedly stated she

 only followed Defendant because he said he knew where to find drugs. In light of this

 evidence, the jury would probably not have reached a different verdict absent the

 evidence of the prior rape. See State v. Walker, 316 N.C. 33, 40, 340 S.E.2d 80, 84

 (1986) (“[T]he overwhelming evidence against the defendant prevented the error

 complained of from rising to the level of ‘plain error[.]’ ”). Consequently, the trial

 court did not commit plain error by admitting evidence of the prior alleged rape.
 STATE V. MACK

 2021-NCCOA-215

 Opinion of the Court

 II. Reportable Offenses and Satellite-Based Monitoring

¶ 29 Defendant also argues the trial court erred by finding his convictions under

 former N.C. Gen. Stat. §§ 14-27.3 and 14-27.5 were “sexually violent offenses”

 pursuant to N.C. Gen. Stat. § 14-208.6(5). As such, according to Defendant, his

 convictions were not reportable convictions under N.C. Gen. Stat. § 14-208.6(4), and

 the trial court could not order Defendant to register as a sex offender. Moreover,

 Defendant argues the trial court did not conduct a separate hearing regarding

 satellite-based monitoring and, thus, could not order Defendant to enroll in satellite-

 based monitoring.

¶ 30 As a threshold matter, Defendant did not file written notice of appeal from the

 trial court’s Orders. Rule 3 of our Rules of Appellate Procedure governs notices of

 appeal from the Sex Offender Registration Orders. State v. Brooks, 204 N.C. App.

 193, 194-95, 693 S.E.2d 204, 206 (2010). Rule 3 requires parties to file written notice

 of appeal thirty days after the entry of such a judgment or order. N.C.R. App. P. 3(a),

 (c) (2021). Therefore, giving oral notice of appeal in open court is “insufficient to

 confer jurisdiction on this Court.” Brooks, 204 N.C. App. at 194-95, 693 S.E.2d at

 206. Recognizing his trial counsel only gave oral Notice of Appeal from the criminal

 Judgments and did not file written notice of appeal from the Sex Offender

 Registration Orders, Defendant has filed a Petition for Writ of Certiorari with this

 Court to grant review of the Sex Offender Registration Orders.
 STATE V. MACK

 2021-NCCOA-215

 Opinion of the Court

¶ 31 Rule 21 of our Rules of Appellate Procedure provides: “[t]he writ of certiorari

 may be issued in appropriate circumstances by either appellate court to permit review

 of the judgments and orders of trial tribunals when the right to prosecute an appeal

 has been lost by failure to take timely action[.]” N.C.R. App. P. 21(a)(1) (2021); see

 also N.C. Gen. Stat. § 7A-32(c) (2019). In our discretion, we allow Defendant’s

 Petition and review the merits of his arguments. See State v. Green, 229 N.C. App.

 121, 128, 746 S.E.2d 457, 464 (2013) (granting certiorari where “[d]efendant conceded

 that although he properly gave oral notice of appeal in open court, he failed to file

 written notice of appeal” from the trial court’s sex offender order).

 A. Reportable Convictions

¶ 32 Here, the trial court found Defendant had been convicted of sexually violent

 offenses and, thus, reportable convictions. The trial court also found Defendant was

 a recidivist and that the offenses were aggravated offenses. Accordingly, the trial

 court ordered Defendant to register as a sex offender for life. A trial court’s statutory

 interpretation in sex offender registration cases is a question of law we review de

 novo. State v. Davison, 201 N.C. App. 354, 357, 689 S.E.2d 510, 513 (2009) (citations

 omitted). “In matters of statutory interpretation . . . ‘[w]hen the language of a statute

 is clear and without ambiguity, it is the duty of this Court to give effect to the plain

 meaning of the statute, and judicial construction of legislative intent is not required.’

 ” Id. (quoting State v. Abshire, 363 N.C. 322, 329-30, 677 S.E.2d 444, 450 (2009)).
 STATE V. MACK

 2021-NCCOA-215

 Opinion of the Court

¶ 33 “A person who is a State resident and who has a reportable conviction shall be

 required to maintain registration with the sheriff of the county where the person

 resides.” N.C. Gen. Stat. § 14-208.7(a) (2019). A “reportable conviction” is any final

 conviction: “for an offense against a minor”; for “a sexually violent offense,”; “in

 another state of an offense, which if committed in this State, is substantially similar

 to an offense against a minor or a sexually violent offense as defined by this section”;

 or “in a federal jurisdiction (including court martial) of an offense, which is

 substantially similar to an offense against a minor or a sexually violent offense as

 defined by this section.” N.C. Gen. Stat. § 14-208.6(4)(a)-(c) (2019).

¶ 34 The trial court found Defendant’s convictions for former N.C. Gen. Stat. §§ 14-

 27.3 and 14-27.5 were sexually violent offenses. In 2015, the General Assembly

 repealed and recodified both N.C. Gen. Stat. §§ 14-27.3 (second-degree rape) and 14-

 27.5 (second-degree sexual offense). An Act to Reorganize, Rename, and Renumber

 Various Sexual Offenses . . . , S.L. 2015-181, 2015 N.C. Sess. Laws 460 (the Act). The

 General Assembly also changed the definition of “sexually violent offense.” N.C. Gen.

 Stat. § 14-208.6(5) now defines a sexually violent offense as:

 A violation of former G.S. 14-27.6 (attempted rape or sexual
 offense), G.S. 14-27.21 (first-degree forcible rape), G.S. 14-27.22
 (second-degree forcible rape), G.S. 14-27.23 (statutory rape of a
 child by an adult), G.S. 14-27.24 (first-degree statutory rape), G.S.
 14-27.25(a) (statutory rape of a person who is 15 years of age or
 younger and where the defendant is at least six years older), G.S.
 14-27.26 (first-degree forcible sexual offense), G.S. 14-27.27
 STATE V. MACK

 2021-NCCOA-215

 Opinion of the Court

 (second-degree forcible sexual offense), G.S. 14-27.28 (statutory
 sexual offense with a child by an adult), G.S. 14-27.29 (first-
 degree statutory sexual offense), G.S. 14-27.30(a) (statutory
 sexual offense with a person who is 15 years of age or younger and
 where the defendant is at least six years older), G.S. 14-27.31
 (sexual activity by a substitute parent or custodian), G.S. 14-
 27.32 (sexual activity with a student), G.S. 14-27.33 (sexual
 battery), G.S. 14-43.11 (human trafficking) if (i) the offense is
 committed against a minor who is less than 18 years of age or (ii)
 the offense is committed against any person with the intent that
 they be held in sexual servitude, G.S. 14-43.13 (subjecting or
 maintaining a person for sexual servitude), G.S. 14-178 (incest
 between near relatives), G.S. 14-190.6 (employing or permitting
 minor to assist in offenses against public morality and decency),
 G.S. 14-190.9(a1) (felonious indecent exposure), G.S. 14-190.16
 (first degree sexual exploitation of a minor), G.S. 14-190.17
 (second degree sexual exploitation of a minor), G.S. 14-190.17A
 (third degree sexual exploitation of a minor), G.S. 14-202.1
 (taking indecent liberties with children), G.S. 14-202.3
 (Solicitation of child by computer or certain other electronic
 devices to commit an unlawful sex act), G.S. 14-202.4(a) (taking
 indecent liberties with a student), G.S. 14-205.2(c) or (d)
 (patronizing a prostitute who is a minor or has a mental
 disability), G.S. 14-205.3(b) (promoting prostitution of a minor or
 a person who has a mental disability), G.S. 14-318.4(a1) (parent
 or caretaker commit or permit act of prostitution with or by a
 juvenile), or G.S. 14-318.4(a2) (commission or allowing of sexual
 act upon a juvenile by parent or guardian). The term also
 includes the following: a solicitation or conspiracy to commit any
 of these offenses; aiding and abetting any of these offenses.

 N.C. Gen. Stat. § 14-208.6(5) (2019).

¶ 35 Defendant is correct that former N.C. Gen. Stat. §§ 14-27.3 and 14-27.5 are no

 longer expressly listed as sexually violent offenses under the current version of N.C.

 Gen. Stat. § 14-208.6(5). For its part, the State fails to provide any compelling
 STATE V. MACK

 2021-NCCOA-215

 Opinion of the Court

 argument to the contrary, instead relying on statutory interpretations of N.C. Gen.

 Stat. § 14-208.6(5) and related arguments that would result only in a misreading and

 misapplication of the express statutory language—if not just ignoring it altogether.3

¶ 36 Our own analysis, however, reveals the Act that recodified N.C. Gen. Stat. §§

 14-27.3 and 14-27.5 and amended N.C. Gen. Stat. § 14-208.6(5) also included an

 “effective date” clause stating:

 This act becomes effective December 1, 2015, and applies to
 offenses committed on or after that date. Prosecutions for
 offenses committed before the effective date of this act are not
 abated or affected by this act, and the statutes that would be
 applicable but for this act remain applicable to those prosecutions.

 S.L. 2015-181, § 48, 2015 N.C. Sess. Laws 460, 472 (emphasis added).

¶ 37 Defendant was prosecuted and convicted under the former statutes for acts he

 committed in 2011, prior to the effective date of the amended N.C. Gen. Stat. § 14-

 208.6(5). According to the Act’s plain language, the prior version of N.C. Gen. Stat. §

 3 For instance, the State argues statutory language, permitting a trial court to decide

 whether an offense committed under the law of another sovereign—i.e. another state or the
 federal government—is substantially similar so as to qualify as a reportable offense, permits
 our courts to ignore the exclusive list of North Carolina statutes provided by the General
 Assembly and simply judicially engraft into the statute other offenses under North Carolina
 law the General Assembly could have listed, but did not. The State also argues “common
 sense” allows us to ignore the statutory language and decree Defendant’s convictions should
 be reportable offenses. Finally, the State also speculates had Defendant been charged and
 tried of crimes that are listed in the current statute, a jury would have convicted Defendant
 of those offenses, too; and, thus, we should conclude the offenses for which Defendant was, in
 fact, convicted, should be considered reportable offenses. Each of these arguments is
 untenable.
 STATE V. MACK

 2021-NCCOA-215

 Opinion of the Court

 14-208.6(5)—in which N.C. Gen. Stat. §§ 14-27.3 and 14-27.5 were listed—which

 would have applied, but for the 2015 amendment, still applies to prosecutions and

 convictions under those former offenses. Therefore, in this case, Defendant’s

 convictions under N.C. Gen. Stat. §§ 14-27.3 and 14-27.5 were sexually violent

 offenses and were reportable convictions for the purpose of requiring Defendant to

 register as a sex offender. 4 See State v. Dye, 254 N.C. App. 161, 170 n. 3, 802 S.E.2d

 737, 743 n. 3 (2017) (“Sexually violent offense is, in turn, defined as including, inter

 alia, ‘a violation of . . . G.S. 14-27.25(a).’ N.C. Gen. Stat. § 14-208.6(5). N.C.G.S. §

 14-27.7A, of which Defendant was convicted, was later recodified at N.C. Gen. Stat.

 § 14-27.25(a) in 2015. See 2015 N.C. Sess. Laws ch. 181 § 7(a). Therefore, Defendant’s

 conviction qualified as a reportable conviction.”). Consequently, the trial court did

 not err in ordering Defendant to register as a sex offender.

 B. Satellite-Based Monitoring

¶ 38 Finally, Defendant argues the trial court could not impose satellite-based

 monitoring without holding a hearing on the issue. Whether a trial court has properly

 adhered to the procedures for imposing satellite-based monitoring under N.C. Gen.

 4 For reference purposes, the University of North Carolina School of Government has
 published a flow-chart which assists in identifying crimes which may constitute reportable
 convictions. Jamie Markham, Revised Sex Offender Flow Chart (July 2017 Edition),
 https://nccriminallaw.sog.unc.edu/revised-sex-offender-flow-chart-july-2017-edition/ (last
 visited May 3, 2021).
 STATE V. MACK

 2021-NCCOA-215

 Opinion of the Court

 Stat. § 14-208.40A is a question of law we review de novo. Davison, 201 N.C. App. at

 357-61, 689 S.E.2d at 513-15.

¶ 39 N.C. Gen. Stat. § 14-208.40A provides:

 (a) When an offender is convicted of a reportable conviction as
 defined by G.S. 14-208.6(4), during the sentencing phase, the
 district attorney shall present to the court any evidence that (i)
 the offender has been classified as a sexually violent predator
 pursuant to G.S. 14-208.20, (ii) the offender is a recidivist, (iii) the
 conviction offense was an aggravated offense, (iv) the conviction
 offense was a violation of G.S. 14-27.23 or G.S. 14-27.28, or (v) the
 offense involved the physical, mental, or sexual abuse of a minor.
 The district attorney shall have no discretion to withhold any
 evidence required to be submitted to the court pursuant to this
 subsection.

 The offender shall be allowed to present to the court any evidence
 that the district attorney’s evidence is not correct.

 (b) After receipt of the evidence from the parties, the court shall
 determine whether the offender’s conviction places the offender
 in one of the categories described in G.S. 14-208.40(a), and if so,
 shall make a finding of fact of that determination, specifying
 whether (i) the offender has been classified as a sexually violent
 predator pursuant to G.S. 14-208.20, (ii) the offender is a
 recidivist, (iii) the conviction offense was an aggravated offense,
 (iv) the conviction offense was a violation of G.S. 14-27.23 or G.S.
 14-27.28, or (v) the offense involved the physical, mental, or
 sexual abuse of a minor.

 (c) If the court finds that the offender has been classified as a
 sexually violent predator, is a recidivist, has committed an
 aggravated offense, or was convicted of G.S. 14-27.23 or G.S. 14-
 27.28, the court shall order the offender to enroll in a satellite-
 based monitoring program for life.

 N.C. Gen. Stat. § 14-208.40A(a)-(c) (2019) (emphasis added).
 STATE V. MACK

 2021-NCCOA-215

 Opinion of the Court

¶ 40 Thus, the statute requires the trial court, when considering imposing satellite-

 based monitoring during the sentencing phase, to conduct a hearing where: the State

 shall present evidence to the trial court regarding the defendant’s eligibility; the

 defendant shall be permitted to rebut that evidence; and, after the trial court receives

 the evidence, the trial court shall determine if the defendant is eligible for monitoring

 and, if so, shall order the defendant to enroll in such monitoring.

¶ 41 Here, the trial court found—after only eliciting evidence of recidivism from the

 State and for sentencing purposes:

 In regards to AOC CR 615, show the Defendant has been
 convicted of a sexually violent offense. That’s under 1(B), that the
 Defendant has not been classified as a sexually violent predator.
 The Defendant is a recidivist, paragraph three. The offense is an
 aggravated offense, paragraph four. The offense did not involve
 the physical, mental, or sexual abuse of a minor. The Defendant
 will be required to register as a sex offender for the rest of his
 natural life, the Court determines as a condition of the statute.

 However, the trial court acknowledged satellite-based monitoring required “a

 separate hearing.” The State elected to not proceed with that hearing during the

 sentencing phase stating: “they can deal with [satellite-based monitoring] at a

 separate hearing.”5 As such, the State presented no evidence as to Defendant’s

 5 Such a hearing would be governed by N.C. Gen. Stat. § 14-208.40B. See N.C. Gen.
 Stat. § 14-208.40B(a)-(c) (2019) (“When an offender is convicted of a reportable conviction as
 defined by G.S. 14-208.6(4), and there has been no determination by a court on whether the
 offender shall be required to enroll in satellite-based monitoring, the Division of Adult
 STATE V. MACK

 2021-NCCOA-215

 Opinion of the Court

 eligibility regarding monitoring, and Defendant was not afforded the opportunity to

 present evidence contradicting the State’s evidence. Thus, the trial court did not

 conduct a hearing on the issue, pursuant to N.C. Gen. Stat. § 14-208.40A, and erred

 by ordering Defendant to enroll in satellite-based monitoring prior to holding the

 required hearing on the issue. See State v. Sheridan, 263 N.C. App. 697, 708, 824

 S.E.2d 146, 154 (2019) (“In this case, no evidence was presented prior to or to support

 the trial court’s determination that Defendant would be subject to SBM for the

 remainder of his life. We vacate the order requiring Defendant to enroll in SBM for

 the remainder of his life, and remand for proper analysis and determination under

 N.C. Gen. Stat. § 14-208.40A.”). Consequently, we vacate the trial court’s Sex

 Offender Registration Orders and remand the issue of satellite-based monitoring for

 proper analysis pursuant to N.C. Gen. Stat. § 14-208.40A.

 Conclusion

¶ 42 Accordingly, for the foregoing reasons, (I) there was no plain error in

 Defendant’s trial and we affirm the Judgments entered upon the jury verdicts; and

 (II) (A) the trial court properly concluded Defendant’s convictions in this case were

 sexually violent offenses and, thus, reportable offenses; however, (B) the trial court

 erred in ordering Defendant enroll in satellite-based monitoring without holding a

 Correction . . . shall make an initial determination” and the trial court of the county where
 the offender lives shall conduct a hearing as to the offender’s eligibility.).
 STATE V. MACK

 2021-NCCOA-215

 Opinion of the Court

hearing on the issue, and we vacate the Sex Offender Registration Orders and

remand this matter to the trial court for further proceedings on satellite-based

monitoring.

 NO PLAIN ERROR AT TRIAL; AFFIRMED IN PART; VACATED IN PART

 AND REMANDED.

 Judges DILLON and GRIFFIN concur.